## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,**

*Plaintiff,*

v.

**MIKE HILGERS,** in his official capacity as Attorney General of Nebraska,

*Defendant.*

No. _____

## COMPLAINT FOR DECLARATORY AND PERMANENT INJUNCTIVE RELIEF

1.    Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") brings this Complaint to challenge Nebraska Legislative Bill 168 ("L.B. 168"), and states as follows:

## PRELIMINARY STATEMENT

2.    The basic question in this case is whether states can add conditions on participation in a federal spending program beyond the ones Congress chose to impose.  The answer under the Supremacy Clause is no.

3.    The state law at issue here, L.B. 168, is Nebraska's attempt to rewrite the terms of a federal program known as the 340B Drug Pricing Program, 42 U.S.C. § 256b ("340B"), enacted pursuant to Congress's spending power.

4.    "Through Medicare and Medicaid, [the federal government] pays for almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).  The federal government thus has extraordinary leverage to use the promise of federal funding under those programs to get drug manufacturers to agree to terms it could not impose on them directly.  And Congress "uses that market power to get drug makers to subsidize healthcare." *Id.*

5.    In particular, through the federal 340B program, "[a]s a condition of participating in Medicare Part B and Medicaid, [Congress] requires drug manufacturers to sell certain drugs . . . at bargain prices" to certain enumerated types of healthcare providers ("covered entities"). *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455 (D.C. Cir. 2024).

6.    Congress could not do this outside the terms of a federal spending program.  In any other context, a law (federal or state) that simply compelled private parties to sell their property at steep discounts would raise serious constitutional concerns.  But "Congress may 'regulate where it otherwise could not'—beyond its enumerated powers, in other words—by imposing conditions

1

on federal funds," provided the recipients "'consent to the bargain.'"  *Ali v. Adamson*, 132 F.4th 924, 931 (6th Cir. 2025); *see, e.g.*, *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983).  And that is precisely what Congress has done with the 340B program, making participation in it one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s]," *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 59 (2006).

7.    Through L.B. 168, Nebraska is seeking to add more conditions, requiring drug manufacturers to offer steep price reductions even when 340B does not require them to do so. L.B. 168 does not purport to impose reduced pricing obligations outright.  It instead imposes its additional obligations on a drug manufacturer if—and only if—it participates in 340B as a condition of its receipt of federal funds under Medicare and Medicaid.  In other words, Nebraska seeks to impose its own obligations on any manufacturer that accepts federal funds under those federal programs.  That attempt to rework a federal spending program is impermissible.  *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 453-60 (S.D. W. Va. 2024) (preliminarily enjoining state 340B statute as likely preempted); *cf. Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011) (holding common law remedy displaced because Congress trusted federal agency alone with administration of 340B).

8.    Even putting aside Nebraska's impermissible attempt to add requirements onto a federal spending program, L.B. 168 conflicts with the federal program in several ways, rendering it preempted even under the standard that applies to ordinary federal legislation.

9.    **First**, L.B. 168 fundamentally alters the nature of manufacturers' 340B obligation and the bargain between manufacturers and the federal government by compelling manufacturers to sell at the 340B price in circumstances where Congress did not require them to do so.  340B

requires only that drug manufacturers make an "offer" to sell certain of their drugs to covered entities at "strikingly generous" prices—sometimes as low as "penn[ies] per unit." *Novartis*, 102 F.4th at 456; 42 U.S.C. § 256b(a)(1)-(4). Covered entities, in turn, are limited in what they can do with 340B-priced drugs: By statute, they are barred from selling *or* transferring 340B-priced drugs to anyone other than their patients, which is known as "diversion." 42 U.S.C. § 256b(a)(5)(B). Although pharmacies are not among the enumerated covered entities under 340B, for-profit pharmacies, referred to as "contract pharmacies," now routinely team up with covered entities to seek access to 340B-priced drugs to make additional profit.

10.    Two federal appellate courts have made clear that manufacturers may attach reasonable conditions to their federal 340B offers, including restrictions limiting the number of contract pharmacies to which manufacturers will provide 340B-priced drugs and requirements that covered entities submit claims data for 340B-priced drugs. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. That "bona fide" offer framework, as explained in *Novartis*, establishes the scope of a manufacturer's obligation to provide 340B-priced drugs for participating in 340B. 102 F.4th at 460-64. Under federal law, the 340B price only applies where a covered entity accepts the offer by assenting to manufacturers' contract-pharmacy conditions; otherwise, there is no purchase to which the 340B price attaches. *See id*.

11.    L.B. 168 disregards Congress's framework entirely and outlaws the very same conditions that federal courts have repeatedly affirmed are permissible in a 340B offer. It thus compels 340B-priced sales in circumstances where Congress did not require and manufacturers did not agree, increasing dramatically manufacturers' cost of participation in 340B, Medicare, and Medicaid.

12.     By compelling 340B sales that would not occur in the absence of L.B. 168, the state law directly conflicts with federal law in both operation and effect.  In operation, L.B. 168 attempts to override Congress's choice to implement 340B through an "offer" framework that allows manufacturers to impose reasonable conditions, including contract pharmacy limitations, on their offers.  *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (holding state law that "interfere[d] with the methods by which the federal statute was designed to reach [its] goal" preempted).  And in effect, L.B. 168 attempts to expand the scope of manufacturers' 340B obligations (otherwise the law would serve no purpose), fundamentally altering the balance struck by Congress for manufacturer participation in 340B.  *See, e.g., id.* (finding state law preempted because it "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *Forest Park II v. Hadley*, 336 F.3d 724, 730, 732-33 (8th Cir. 2003) (holding that where Congress enacts a program that relies on participation by private parties via incentives and sets the obligations of those private parties under the program, additional state obligations conflict with the federal scheme, whether or not they purportedly serve the same "purpose"); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 531 (5th Cir. 2013) (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted).

13.     Recognizing that any attempt by a state to directly compel 340B pricing would be preempted, other states enacting similar laws have tried to justify them as imposing only a *delivery* obligation on *completed* 340B transactions.  But Nebraska's statute cannot be saved by casting it as a post-purchase delivery obligation.  As discussed, when a covered entity rejects a manufacturer's offer containing contract pharmacy conditions, there is no 340B purchase to which L.B. 168 can attach a delivery obligation.  Instead, L.B. 168's plain language reveals its true aim.  The state law defines a "340B drug" subject to state regulation as "a drug that a 340B entity *may*

*purchase* at a reduced price pursuant to 42 U.S.C. § 256b," and goes on to provide that a manufacturer "shall not, either directly or indirectly, *deny, restrict, or prohibit* the <u>*acquisition of any 340B drug by*</u> . . . any location authorized by any *340B entity* to receive such 340B drug …." L.B. 168 §§ 2(1), 3 (emphasis added).  The statute thus seeks to compel manufacturers to allow the purchase of 340B-priced drugs even though the offered conditions were *not accepted*, so long as the drug is one that a covered entity otherwise "may purchase" under 340B.  *Id.*  In other words, Nebraska mandates the sale of drugs at 340B *prices* that are not required under 340B itself.  That attempt to rework the bounds of the federal program is preempted.

14.     This expansion of 340B beyond federal bounds is lining the pockets of for-profit pharmacies and administrators, which were never intended to benefit from 340B.  As reflected in a recent report from the Minnesota Department of Health, approximately $1 out of $6 of gross revenue by covered entities nationwide went to contract pharmacies and third-party administrators, who run the black-box algorithms to find allegedly 340B-eligible patients.  Minn. Dep't of Health, *340B Covered Entity Report* at 9 (Nov. 25, 2024), https://tinyurl.com/ysrsex84.  Both CVS and Walgreens, for example, have publicly disclosed that 340B profits are material to their finances and that a reduction in contract pharmacy arrangements "could materially and adversely affect" their finances.  CVS, SEC Form 10-K at 23 (2024), https://tinyurl.com/4pbtt9x8; Walgreens, SEC Form 10-K at 30 (2024), https://tinyurl.com/zp9vv465; *see also* S. Comm. on Health, Educ., Lab., & Pensions, Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program 26-27 (Apr. 2025) (reflecting CVS's third-party administrator, Wellpartner, generated $1.6 billion in revenue from covered entities from 2019 to 2023 through third-party administrator fees), https://tinyurl.com/3rh429c9.

15.    **Second**, L.B. 168 breaks the federal remedial regime by essentially hiding from manufacturers details on 340B-priced drugs that are dispensed. L.B. § 168 § 3(2). Through claims data conditions, manufacturers require covered entities and their contract pharmacies to provide certain data on the prescriptions they claim are 340B-eligible so that they can identify potential duplicate discounts and diversion. *See Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at *8 (D.D.C. Nov. 5, 2021) (stating manufacturer "convincingly argues that the claims data conditions that it has added to its new 340B policy will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B"). As both the D.C. and Third Circuits have held, claims data conditions are allowed in 340B offers. *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. Yet L.B. 168 expressly prohibits manufacturers from requiring claims data. *See* L.B. 168 §§ 2(1), 3(2).

16.    In addition to conflicting with Congress's offer framework, the claims data prohibition directly interferes with the remedial scheme Congress designed for 340B. Under the federal regime, manufacturers must first audit a covered entity before initiating ADR—the exclusive mechanism for resolving 340B disputes between manufacturers and covered entities, *Astra*, 563 U.S. at 120—and must also show reasonable cause to the federal agency in order to initiate that first-step audit. *See infra* ¶ 137. L.B. 168's claims data prohibition directly interferes with both steps of that process, hiding from manufacturers the very information needed to initiate audits. Without that type of data, manufacturers are effectively cut off from utilizing the federal enforcement regime. *Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data was preempted because it conflicted with manufacturers' 340B audit rights); *Eli Lilly & Co. v. Kennedy*, 2025 WL 1423630, at *2-4, *9 n.11, *12-14 (D.D.C. May 15, 2025) (affirming manufacturers' right to "impose data-reporting conditions on covered entities,"

6

explaining why claims data is important to maintaining program integrity, and requiring [U.S. Department of Health and Human Services ("HHS")] to take it into account when considering how manufacturers can structure their program participation).

17.    **Third**, more generally, L.B. 168 impermissibly intrudes on and conflicts with the exclusive federal enforcement regime that Congress established.  To incentivize continued participation in 340B and maintain uniformity, Congress authorized the Secretary of HHS, superintended by federal courts, to administer and enforce 340B through a range of carefully balanced and exclusive federal mechanisms.  42 U.S.C. § 256b(d).  Those mechanisms include a unique ADR scheme run by the U.S. Health Resources and Services Administration ("HRSA"), an agency within HHS.  *Astra*, 563 U.S. at 120 (explaining that Congress intended HHS to "hold the control rein" to ensure that 340B is administered "harmoniously on a uniform, national basis"). HHS itself has concluded that those federal remedies are an appropriate tool for addressing the sorts of issues L.B. 168 seeks to regulate.  89 Fed. Reg. 28, 643, 28,649 (Apr. 19, 2024).

18.    Yet Nebraska believes it can create its own competing enforcement regime.  But as the Supreme Court already explained in *Astra* when concluding that covered entities cannot enforce 340B through private suits, "recognizing [covered entities'] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities," wresting control from the federal government and creating "substantial" "risk of conflicting adjudications."  563 U.S. at 120.  Suits by Nebraska and the 49 other states pose exactly the same problem.  Among other things, a Nebraska decisionmaker will need to decide multiple questions of federal law before imposing liability for a purported violation of L.B. 168.  42 U.S.C. § 256b(a)(4)-(5).  If Nebraska and other states are permitted to render decisions on these core federal issues, the uniform federal program will cease to be federal or uniform.

19.    For at least those four reasons, L.B. 168 is preempted.

20.    Nebraska may seek to rely on *Pharmaceutical Research & Manufacturers of America*, which addressed a different state law that sought to regulate 340B.  95 F.4th 1136 (8th Cir. 2024).  But *McClain* did not address the first two theories of preemption: *McClain* predated the D.C. Circuit's explication of the offer-and-acceptance framework in *Novartis*, and did not involve an express claims data prohibition.  To the extent *McClain* addressed the third theory in the context of the Arkansas law at issue there, its analysis is inapplicable here.  *McClain* did not grapple with the nature of 340B, which is a federal spending program.  And *McClain* viewed contract pharmacies as essentially the alter egos of covered entities, based on a summary judgment record that the court incorrectly concluded showed that covered entities retain title over 340B drugs purchased and held by contract pharmacies, and that contract pharmacies act as the agents of the covered entities.  *See* 95 F.4th at 1142.  By contrast and as alleged here, the widespread use of the replenishment model in Nebraska shows that those factual predicates *cannot* be true in this case:  In Nebraska, covered entities do not generally retain title to 340B drugs ordered and held by contract pharmacies, and contract pharmacies do not act as agents of covered entities.  Were *McClain* to somehow apply to limit PhRMA's third claim in some part, PhRMA preserves this claim in full for further appellate review.

21.    L.B. 168 also violates the Constitution's prohibition on state extraterritorial regulation.  It directly regulates wholly out-of-state transactions.  Indeed, L.B. 168 contains no provisions limiting its application to manufacturers, distributors, covered entities, or pharmacies located in the state of Nebraska, or even drug sales occurring in Nebraska.  The recent decision in *Association for Accessible Medicines v. Ellison* confirms that states cannot regulate drug prices beyond a state's borders, even if the drugs are ultimately delivered into the state.  __ F.4th __,

2025 WL 1660112, at *1-3 (8th Cir. June 12, 2025).  This problem, too, renders L.B. 168 unconstitutional.

22.    For those reasons and the ones that follow, PhRMA respectfully requests that the Court declare unlawful L.B. 168's improper intrusion into the federal 340B scheme and enjoin L.B. 168's enforcement against PhRMA's members and as to the sale of their drugs.

## PARTIES

23.    PhRMA, a trade association representing the nation's leading innovative biopharmaceutical research companies, advocates for policies that encourage the discovery and development of important new pharmaceutical products.

24.    PhRMA's members, which manufacture and sell pharmaceutical products, participate in the federal 340B program and will thus be forced to supply their drugs at a steeply reduced price under L.B. 168 or otherwise face significant penalties.

25.    Neither the claims asserted nor the relief sought in the Complaint requires the participation of any individual member of PhRMA.

26.    Defendant Mike Hilgers is the Attorney General of Nebraska, the chief law enforcement officer of the state, and is sued solely in his official capacity as Attorney General.  L.B. 168 gives the Attorney General authority to enforce its provisions.  L.B. 168 § 4.

## JURISDICTION AND VENUE

27.    PhRMA's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.  The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

28.    The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration.  28 U.S.C. § 2201(a).

29.    This Court has inherent equitable powers to enjoin the actions of state officials if they contradict the federal Constitution or federal law. *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

30.    Venue is proper in this district because this action challenges a Nebraska law applicable to the sale of PhRMA's members' drugs in this district, and thus L.B. 168 purports to directly restrict and restrain PhRMA's members' conduct in selling and distributing drugs within this district.  28 U.S.C. § 1391(b)(2).

31.    Substantial amounts of PhRMA's members' drugs are sold under the 340B program to covered entities in this district.  For example, HRSA's website reflects that there are numerous covered entity sites in this district.    *See* HRSA, Covered Entity Search Criteria, https://340bopais.hrsa.gov/coveredentitysearch.   The same HRSA website reflects that those covered entities maintain a substantial number of contract pharmacy arrangements, including with contract pharmacies in this district.   Accordingly, L.B. 168 is likely to be enforced against PhRMA's members in this district.

32.    Venue is also proper in this district because Defendant maintains offices in Lincoln, Nebraska, in this district.  28 U.S.C. § 1391(b)(1).

## BACKGROUND

### A.    The History of 340B

33.    Congress established 340B in 1992 to restore drug discounts that had been provided voluntarily by manufacturers to a select group of safety-net providers before Congress passed the Medicaid Drug Rebate Program ("MDRP") in 1990.  Indeed, Congress carefully restricted the list of eligible 340B covered entities to certain enumerated types of entities that "provide direct clinical care to large numbers of uninsured Americans."   H.R. Rep. No. 102-384, pt. 2, at 12 (1992) ("House Report").

34.    Prior to the enactment of 340B, drug manufacturers had offered discounts on certain outpatient drugs on a voluntary basis to direct healthcare providers like covered entities, but not to pharmacies.  *See* Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-And-A-Half Decades of Uncertainty*, 22 J. Health Care L. & Pol'y 25, 29-30 (2019) ("Prior to the MDRP, drug manufacturers regularly offered discounts to . . . hospitals and other safety net providers").  When Congress passed the MDRP in 1990, that law took the manufacturers' previous *voluntary* "large discounts" to safety net providers like covered entities and factored it into the calculation of *required* "best price" for purposes of determining Medicaid rebates*. Id.* at 29-30.  The "unintended consequence" of this pricing "snafu" was that drug manufacturers were "disincentivized" from continuing to provide the voluntary discounts they had provided to safety net providers prior to the MDRP's passage.  *See id.*; *see also* H.R. Rep. No. 102-384, pt. 2, at 9-10 (1992).

35.    Congress created 340B to address the limited problem created by the MDRP's enactment, specifically to restore the discounts that were previously offered voluntarily by manufacturers.  *See* Pub. L. No. 102-585, 106 Stat. 4943, 4962; *see also* House Report at 12.  When Congress passed 340B, the legislative history indicates that it intended to restore "discounts to these clinics, programs, and hospitals," i.e., "direct clinical care" entities, which had previously received voluntary discounts.  House Report at 12.

36.    When it passed the 340B law in 1992, Congress estimated that the Program would only include approximately 90 hospitals, 85 family-planning clinics, 120 AIDS-intervention sites, 54 AIDS drug purchasing assistance programs, a network of hemophilia treatment centers with 150 facilities, and 2,225 health centers that qualified to participate.  *Id.* at 13.

**B.    The Operation and Growth of 340B**

37.    340B has grown dramatically in the intervening years.

38.    With the list price value (*i.e.*, based on wholesale acquisition cost) of 340B purchases rising to $147.8 billion in 2024 alone, 340B has become the second largest government pharmaceutical program, exceeded only by Medicare Part D.  Adam J. Fein, *Drug Channels News Roundup, June 2025*, Drug Channels (June 24, 2025), https://tinyurl.com/4m55984e; Rory Martin & Harish Karne, IQVIA, *The Size & Growth of the 340B Program in 2024* 1, https://tinyurl.com/2xd65y7c.

39.    340B is supposed to be governed by a federal statutory framework.  Under 340B, participating manufacturers "*shall offer*" to each "covered entity" (as delineated by the federal 340B statute) certain outpatient drugs (also specified by statute) at or below a price (again set by statute), *if* such drugs are offered to any other purchasers, meaning manufacturers must make a genuine offer to covered entities for purchase of 340B-priced drugs.  42 U.S.C. § 256b(a)(1).  That requirement does not involve an obligation to provide 340B-priced drugs to an unlimited number of contract pharmacies.  *See infra* ¶¶ 43-44, 99-105.

40.    Federal law defines "covered entity" for purposes of 340B to mean an entity that "is one of" 15 types of specifically enumerated categories of healthcare providers, 42 U.S.C. § 256b(a)(4), and that meets other specifically enumerated requirements, including that the entity does not engage in an unlawful transfer of 340B-priced drugs and does not seek or cause a duplicate Medicaid discount (*see infra* ¶ 45).  42 U.S.C. § 256b(a)(5).

41.    Federally Qualified Health Centers, children's hospitals, critical access hospitals, sole community hospitals (*i.e.*, hospitals geographically isolated from other hospitals, 42 U.S.C. § 1395ww(d)(5)(D)(iii)), and certain other clinics and hospitals are all specifically defined as "covered entities" eligible to enroll and participate in 340B.  42 U.S.C. § 256b(a)(4); *see also Am.*

*Hosp. Ass'n v. Azar*, 967 F.3d 818, 820-22 (D.C. Cir. 2020). Retail pharmacies are not among the listed covered entities.

42.     Federal law defines the "ceiling price" for purposes of 340B to mean "the maximum price that covered entities may permissibly be required to pay for the drug." 42 U.S.C. § 256b(a)(1). That ceiling price is deeply reduced compared to the drug's market price.

43.     Manufacturers must "offer" their covered outpatient drugs at or below the applicable "ceiling price" to "covered entities," and only "covered entities" may receive this pricing under the express terms of federal law. *See id.*

44.     Identifying the specific obligations imposed by 340B's "shall offer" provision on drug manufacturers requires the interpretation of 42 U.S.C. § 256b(a)(1). According to courts that have reviewed this question to date, a drug manufacturer must provide some meaningful path for covered entities to obtain these medications at the 340B price. *See* 42 U.S.C. § 256b(a)(1); *Novartis*, 102 F.4th at 462-64; *Sanofi*, 58 F.4th at 703. But the statute does not mandate a commitment to provide 340B-priced drugs to an unlimited number of contract pharmacies of a covered entity's choosing. *Novartis*, 102 F.4th at 461 ("The requirement to 'offer' drugs at a certain 'price' does not prohibit distribution conditions, much less require the offeror to accede to any distribution terms demanded by the offeree."); *see also Sanofi*, 58 F.4th at 703.

45.     The 340B statute, in turn, forbids covered entities from "resell[ing] or otherwise transfer[ring]" a covered outpatient drug "to a person who is not a patient of the entity," 42 U.S.C. § 256b(a)(5)(B), demonstrating that 340B is intended to be a closed system.

46.     Manufacturers "opt into" 340B by signing a uniform federal contract with HHS "for covered drugs purchased by 340B entities." *Astra*, 563 U.S. at 113. That uniform contract is known as the "Pharmaceutical Pricing Agreement" ("PPA"). *Id.* at 117. PPAs do not vary between

manufacturers, but "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them." *Id.* at 118.

47.    If HHS determines that a manufacturer breached its 340B obligations, HHS can terminate the PPA and remove the manufacturer from the 340B program. *See* 42 U.S.C. § 1396r-8(b)(4)(B)(v); 61 Fed. Reg. 65,406, 65,412-13 (Dec. 12, 1996). And if the manufacturer is removed from the 340B program, its medicines will no longer be eligible to receive reimbursements under Medicaid and Medicare Part B, which would have a profound impact on many vulnerable patient populations. *See* 42 U.S.C. § 1396r-8(a)(1), (a)(5), (b)(4)(B)(v).

48.    Given the stakes for Medicare Part B and Medicaid and their patient populations, Congress chose to assign oversight and enforcement responsibilities exclusively to HHS to ensure the delicate balance that maintains manufacturer participation. HHS, in turn, has delegated 340B's oversight and enforcement to its component agency, HRSA. Neither the 340B statute nor any federal regulations promulgated under it authorize, envision, or create room for state regulation of the 340B program. Indeed, the Supreme Court made that clear in *Astra*, holding that the administration and enforcement provisions established an exclusive system of federal management designed to be "harmoniously" administered on a "nationwide basis," with HHS "hold[ing] the control rein." *Astra*, 563 U.S. at 120.

49.    Congress carefully specified the exclusive mechanisms available for administering 340B disputes and violations: audits, ADR, and an enforcement scheme directed by HHS. For instance, the statute specifies that manufacturers have a right to audit covered entities to ensure that the covered entity is complying with the 340B program's requirements. 42 U.S.C. § 256b(a)(5)(C). Manufacturers, in turn, are also subject to compliance audits. *Id.* § 256b(d)(1)(B)(v).

50.     The imposition of penalties for violating 340B is directly committed to HHS: HRSA evaluates manufacturers' compliance with the 340B statute's requirements and may seek to have HHS impose civil monetary penalties of up to $7,000 on manufacturers that purposefully charge covered entities more than the statutory 340B ceiling price for covered outpatient drugs. 42 U.S.C. § 256b(d)(1)(B)(vi) ($5,000, adjusted for inflation).  "Overcharging" refers to charging a covered entity a price above the applicable 340B "ceiling price."

51.     340B also provides for resolving 340B disputes between manufacturers and covered entities via an ADR process to be established through "[r]egulations promulgated by the Secretary [of HHS]."  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 7102(a), 124 Stat. 119, 826-27 (2010) (codified at 42 U.S.C. § 256b(d)(3)) (amending the statute to require HHS to promulgate regulations establishing ADR).

52.     These regulations must "designate or establish a decision-making official or decision-making body within [HHS] to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price . . . and claims by manufacturers that violations of [statutory prohibitions on unlawful transfers of 340B drugs and duplicate discounts] have occurred."  *Id.* (codified at 42 U.S.C. § 256b(d)(3)(B)(i)); *see* 42 C.F.R. § 10.20 (setting out requirements for ADR review panels).

53.     HRSA regulations also must be designed with such safeguards and "procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously."  42 U.S.C. § 256b(d)(3)(B)(ii).

54.     To ensure finality and repose, the statute provides that "administrative resolution of a claim or claims . . . shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction." *Id.* § 256b(d)(3)(C).

55.     Federal regulations issued in 2024 make clear HRSA's view that it has federal statutory authority to address issues regarding manufacturer contract pharmacy policies, including through ADR.   *See* 89 Fed. Reg. 28,643, 28,649 (Apr. 19, 2024) (defining overcharge to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price").   In other words, the federal government believes it has authority to address the same precise subject matter L.B. 168 purports to regulate.   *Id.*; 42 U.S.C. § 256b(d)(1) (covering "overcharges and other violations of the discounted pricing requirements").

56.     Covered entities must also comply with requirements under 340B.   Covered entities are prohibited from "resell[ing] or otherwise transfer[ring] the drug to a person who is not a patient of the entity" known as "diversion."   *Id.* § 256b(a)(5)(B) (prohibiting unlawful transfers).   Covered entities are also prohibited from seeking or causing unlawful "duplicate discounts or rebates" from manufacturers.   *Id.* § 256b(a)(5)(A).   Such "duplicate discounting" most often occurs when a covered entity obtains a drug at the 340B price and dispenses it to a Medicaid patient, and the manufacturer then also pays a Medicaid rebate to the state Medicaid agency on the same drug.

57.     A covered entity that engages in unlawful transfers or duplicate discounting, which would violate § 256b(a)(5), no longer qualifies as a covered entity under the federal statute.   *Id.* § 256b(a)(4) (specifying that to qualify as a covered entity, the entity must "meet[] the requirements described in paragraph (5)").   Whether a healthcare entity qualifies as a "covered entity" is a decision entrusted to the federal government.

C.    **Contract Pharmacy Abuses**

58.    As noted above, 340B requires that a manufacturer offer 340B pricing only to a "covered entity."  42 U.S.C. § 256b(a)(1).

59.    Retail pharmacies are not "covered entit[ies]," so they are ineligible to receive 340B pricing.

60.    But certain private, for-profit entities—including the largest national chain pharmacies—have, in increasing numbers, sought to leverage 340B as a tool to enhance their profitability in a way that Congress never intended.  This is typically accomplished through complicated contractual arrangements between a covered entity, a pharmacy, and other entities like a third-party administrator.

61.    The core feature of these arbitrage arrangements is that the for-profit pharmacies end up obtaining drugs purchased at the federal 340B price.  These contract pharmacies, however, serve not only patients of 340B covered entities, but the general public as well—despite the fact that 340B-priced drugs are legally permitted to be dispensed only to patients of 340B covered entities.  Inevitably, and at great financial benefit to themselves, contract pharmacies sell drugs purchased at 340B prices to patients who are ineligible to receive such 340B-priced drugs.  *See infra* ¶¶ 75-76.  Contract pharmacies also reap financial benefit when they dispense to 340B-eligible patients: by extracting dispensing fees and a portion of the 340B "spread" (the difference between the 340B price and what payers reimburse them for the drug), for-profit pharmacies divert value Congress intended to go to covered entities and their patients.

62.    Between 2010 and 2018, the number of such contract pharmacy arrangements with covered entities exploded, increasing "more than fifteen-fold, from about 1,300 to approximately 20,000 [as of 2018]."  GAO, GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 10 (2018) ("2018 GAO Report"),

https://tinyurl.com/mr4xbp2m.  A more recent study put the increase between 2010 and 2020 at 4,228%, with now "more than 27,000 individual pharmacies (almost one out of every three pharmacies)" participating in 340B as contract pharmacies.  Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program* 4, Berkeley Rsch. Grp. (Oct. 2020), https://tinyurl.com/3rk5v8nu.  By 2020, each covered entity used an average of 22 contract pharmacies.  *Id.* at 7.  As a result, the number of actual claims for 340B discounts nationwide *tripled* between 2014 and 2019.  *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 billion in 2019; Now Over 8% of Drug Sales*, Drug Channels (June 9, 2020), https://tinyurl.com/5n7bmw5m.

63.    This expansion of the 340B program beyond federal bounds is lining the pockets of for-profit pharmacies and administrators, which were never intended to benefit from this federal program.  For example, reflected in a recent report from the Minnesota Department of Health, approximately $1 out of $6 of gross revenue by covered entities nationwide went to contract pharmacies and third-party administrators, who run the black-box algorithms to find allegedly 340B-eligible patients.  Minn. Dep't of Health, 340B Covered Entity Report at 9 (Nov. 25, 2024), https://tinyurl.com/ysrsex84.

64.    Several federal watchdogs, including the GAO and HHS's own OIG, have warned that the growth of these arrangements exacerbates concerns about abuse and unlawful claims for 340B drugs.  *See* 2018 GAO Report at 44 ("The identified noncompliance at contract pharmacies raises questions about the effectiveness of covered entities' current oversight practices."); *id.* at 45 ("The expansion of contract pharmacies . . . increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts.").

65.    Here is how the system has evolved over recent years:  Under the product "replenishment model" now in widespread use by contract pharmacies,[1] the pharmacies sell drugs from their general inventories to all individuals (both 340B covered entity patients and non-340B covered entity patients)—at prices significantly above the 340B price.  *See Examining Oversight Reports on the 340B Drug Pricing Program: Hearing Before the S. Comm. On Health, Educ. Labor, & Pensions*, 115th Cong. 11 (2018) (statement of Ann Maxwell, Assistance Inspector Gen. for Evaluation & Inspections, OIG) ("Maxwell Testimony") ("[M]any contract pharmacies dispense drugs to all of their customers—340B-eligible *or otherwise*—from their *regular* inventory." (emphasis added)), https://tinyurl.com/5n8jdr9n.

66.    Then, after subsequent data analysis using undisclosed algorithms, the contract pharmacies purport to retroactively identify individuals with some relationship to a covered entity—purported covered entity "patients" who were not previously identified as covered entity "patients" at the time the drug was dispensed.  *Novartis*, 102 F.4th at 457 (noting that the third-party administrators who run these algorithms "often receive a larger fee for every prescription deemed eligible for the discount").[2]  These black-box algorithms likely result in contract pharmacies claiming prescriptions as 340B-eligible where the individual who was dispensed the drug is not a covered entity "patient."  *See* HHS OIG, Mem. Report: Contract Pharmacy Arrangements in the 340B Program, OEI 05-13-00431 16 (Feb. 4, 2014),

---

[1] A recent U.S. Senate report confirmed: "With the rise of contract pharmacy use in the 340B Program, most covered entities now use the virtual inventory/product replenishment model to dispense 340B drugs."  U.S. Sen. Comm. On Health, Educ., Lab. & Pensions, 119th Cong., *Congress Must Act To Bring Needed Reforms To The 340B Drug Pricing Program* 31 (Apr. 2025), https://tinyurl.com/yurm3fey.

[2] *See, e.g.*, 2018 GAO Report at 2; Maxwell Test. at 11.

https://tinyurl.com/yd735xzj.[3]  This process operates in an "after-the-fact" manner inconsistent with the specific program guidance published by HRSA.  Although that guidance provides that each prescription be verified as 340B eligible at the time of drug dispensing, no prescriptions are verified in this manner under the product replenishment model.  *See* 61 Fed. Reg. 43,549, 43,556 (Aug. 23, 1996); *see Novartis*, 102 F.4th at 457 ("Only after dispensing the drugs do these pharmacies attempt to discern whether individual customers were patients of covered entities—in other words, whether individual prescriptions were eligible for the discount.").[4]

67.    The pharmacies then purchase additional drugs at the 340B price—nominally in the name of the covered entities—to "replenish" the drugs sold previously to the purported covered entity patients.  Again, this is done after the fact, without the benefit of data verifying that these retroactively reduced prescriptions were actually 340B eligible.

68.    Once those replenishment drugs are received, the cycle starts anew:  the 340B-priced drugs are again commingled in the pharmacy's general inventory and dispensed to any individual who walks in the door, regardless of covered entity patient status.  Decl. of Krista M. Pedley ¶ 11, *Sanofi-Aventis U.S., LLC v. U.S. Dep't of Health & Human Servs.*, No. 21-cv-00634-PGS-JBD (D.N.J. June 24, 2021), ECF No. 93-2 (HRSA Director of Office of Pharmacy Affairs

---

[3] HHS OIG has acknowledged this problem.  It discussed the following hypothetical: a physician, who practices part-time at a covered entity hospital, gives a prescription to a patient at his private practice.  *See* Maxwell Test. at 11.  Although this prescription would likely not qualify for 340B, *see* 80 Fed. Reg. 52,300, 52,306 (Aug. 28, 2015), one contract pharmacy said it would claim a 340B price because it simply matches the name of the prescriber with those who work at a 340B covered entity *at all* (even if only part time), *see* Maxwell Test. at 11.  This demonstrates how contract pharmacies can expand the definition of an eligible "patient" to cover additional, non-340B prescriptions.  *See also Novartis*, 102 F.4th at 458 (remarking on this very issue).

[4] This is one reason why purchases of 340B-priced drugs have grown tremendously, while the number of patients treated by covered entities has not.  *See* William Smith & Josh Archambault, *340B Drug Discounts: An Increasingly Dysfunctional Federal Program* 5, Pioneer Health (Mar. 2022), https://tinyurl.com/m2n828a9.

stating that under the product replenishment system, contract pharmacies use stock replenished at 340B prices as "neutral inventory" that "may be dispensed to any subsequent patient").

69.     On information and belief, supported by publicly available information, covered entities *do not* retain title to the drugs throughout the process, and contract pharmacies *do not* act as agents of covered entities and instead serve as independent contractors at most.  *See, e.g.*, Walgreens Contract §§ 3.3.5, 8.10, *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-1603 (D.D.C. Nov. 29, 2024), ECF No. 24-2 (showing contract pharmacies take title to the 340B drugs and do not operate as agents of covered entities); Dallas County, 340B Contract Pharmacy Services Agreement – ReCept Pharmacy at 5 (Comm'rs Ct.) ("County shall purchase 340B Drugs through a written contract with the Supplier and shall hold title to such drugs from the time the Supplier fills the order from ReCept [(the contract pharmacy)] made on behalf of the County until the time that ReCept takes delivery of the drugs."), https://tinyurl.com/4wm5d9fd; *see also* Pharmacy Services Agreement Between the County of Monterey and CVS Pharmacy, Inc. at 9, https://tinyurl.com/yr72mhup.

70.     On information and belief, covered entities do not even know beforehand that a contract pharmacy or a third-party administrator is submitting an order for 340B-priced drugs nominally in its name.

71.     As is evident, the product replenishment model seeks to lower the price of drugs for the benefit of commercial pharmacies and covered entities, not patients—by seeking to replenish contract pharmacy inventories with 340B-priced drugs.  There is no dispute that the pharmacies could replenish their inventories by ordering the drugs at market prices, but they instead attempt to do so at 340B prices.

72.    On information and belief, the majority of Nebraska contract pharmacies operate using the product replenishment model.

73.    This product replenishment practice can provide a windfall for covered entities and pharmacies. *See* GAO, GAO-20-108, *340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements* 5 (2019) (explaining that covered entities "purchase [340B-priced] drugs at the 340B Program price for all eligible patients regardless of the patients' income or insurance status" and "receiv[e] reimbursement from patients' insurance that may exceed the 340B prices paid for the drugs"), https://tinyurl.com/bxpnc3ry.  As the D.C. Circuit noted, "[t]he covered entity, the pharmacy, and the third-party administrator [who runs the algorithms referenced above] often divvy up the spread between the discounted price and the higher reimbursement rate." *Novartis*, 102 F.4th at 457.  Accordingly, "[e]ach of these actors . . . has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457-58.

74.    Both CVS and Walgreens, two of the largest for-profit pharmacy retailers, have publicly disclosed that 340B profits are material to their finances. *See supra* ¶ 14.

75.    Patients routinely do not receive the benefit of the discount in the form of lower prescription costs. *See* Summ. J. Hr'g Tr. at 60:2-7, *PhRMA v. Murrill*, No. 6:23-cv-00997, ECF No. 78 (June 7, 2024) (Counsel for covered entity Intervenors:  "Under replenishment, . . . the pharmacy is not going to know that that's a 340B eligible patient.  That's not in the record the pharmacy has available."); Rory Martin & Kepler Illich, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* 3, 12, IQVIA (2022) (concluding that "most 340B-eligible patients at contract pharmacies are not directly benefiting from 340B discounts" and that stakeholders in the 340B program, such as contract pharmacies, are "profit[ing]

from 340B revenue"), https://tinyurl.com/mvuy8276; Rory Martin, et al., *Do Patients Receive 340B Drug Discounts at the Contract Pharmacy Counter?* 9, IQVIA (2025), https://tinyurl.com/596x2ws7; Rory Martin & Harish Karne, *The 340B Drug Discount Program Grew to $124B in 2023* 6, IQVIA (2024) ("If a substantial number of states pass [policies prohibiting the use of contract pharmacy restrictions], it could further accelerate 340B growth in the coming years" and "reignite the problem of duplicate discounts, since it is difficult to determine the 340B status of prescriptions that are filled at contract pharmacies."), https://tinyurl.com/y9aeb727.

76.    Recent evidence continues to reinforce these conclusions.  For example, media reporting has confirmed that in many cases 340B price reductions are not passed on to vulnerable populations in the form of lower prices.  *See* Anna Wilde Matthews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients*, Wall St. J. (Dec. 20, 2022) (explaining that many hospitals do not pass on 340B discounts to their patients and that 340B appears to bolster profits in well-off areas more than helping hospitals in less-privileged neighborhoods), https://tinyurl.com/bdhhzdhr; Katie Thomas & Jessica Silver-Greenberg, *How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, N.Y. Times (Sept. 24, 2022) (explaining how one hospital "nakedly capitaliz[ed] on" 340B to turn a profit), https://tinyurl.com/28ubr4hd; Joseph Walker, *Employers Get Big Drug Discounts Through Program for Hospitals That Serve Poor Patients*, Wall St. J. (Mar. 15, 2025) (explaining how sophisticated middlemen help employers tap 340B to save money on prescription drug programs, a far cry from the program's original focus on aiding low-income patients), https://tinyurl.com/y34ctaf5.

77.     Similarly, a recent GAO report surveying hospitals found that, of the 30 hospitals surveyed that reported use of contract pharmacies, almost half (14) indicated that they do not provide *any* discounts (to patients) at contract pharmacies, 10 reported they provide discounts at some contract pharmacies, and only six provided discounts at all contract pharmacies.  GAO, GAO-23-106095, *340B Drug Discount Program: Increased Oversight Needed to Ensure Nongovernmental Hospitals Meet Eligibility Requirements* 16 (2019), https://tinyurl.com/49jzmnne.  Even among those that do provide discounts, most (10) reported that it varied by pharmacy or patient circumstances, three reported using the patient's co-pay as the "discount," two reported that they charged more than the 340B price the hospital paid, and only one reported charging less than the 340B price.  *Id.* at 17.

78.     State level reports demonstrate similar findings.  A 2024 report from North Carolina's treasurer focusing on North Carolina's State Health Plan and purchased oncology drugs found that 340B hospitals applied an average markup of 5.4 times their discounted acquisition costs compared to the 2.9 times markup applied by non-340B hospitals.  N.C. Treasurer, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program* 14-15 (2024), https://tinyurl.com/26cxtzw4.  And while North Carolina's 340B hospitals reported an average 15.5% net profit margin compared to the 9.4% profit margin for non-340B hospitals, some of the hospitals reporting the lowest levels of charity care were 340B hospitals and 15.6% of 340B hospitals spent less than 1% on charity care.  *Id.* at 19-20.

79.     This unlawful and unauthorized expansion of the federal 340B subsidy has other repercussions as well.  Expanding the subsidy has led to increased consolidation in the healthcare system, with large hospital beneficiaries snapping up smaller physician providers with "no evidence of hospitals using the surplus . . . to invest in safety-net providers, provide more inpatient

care to low-income patients, or enhance care for low-income groups in ways that would reduce mortality." Sunita Desai, Ph.D. & J. Michael McWilliams, M.D., Ph.D., *Consequences of the 340B Drug Pricing Program*, 378 NEW ENG. J. MED. 539, 546 (2018), https://tinyurl.com/nhhtyyah.

80.     Besides taking 340B price reductions intended for vulnerable populations, the explosion in contract pharmacy arrangements has also led to an increase in unlawful transfers of drugs purchased at a 340B price. *See, e.g.*, 42 U.S.C. § 256b(a)(5)(B) (prohibiting transfer or sale to anyone "who is not a patient of the [covered] entity"); GAO, GAO-11-836, *Drug Pricing, Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28 (2011) ("Operating the 340B program in contract pharmacies creates more opportunities for drug diversion compared to in-house pharmacies."), https://tinyurl.com/yc2mhbeu. Approximately two-thirds of violations for unlawful transfers uncovered by HRSA audits "involved drugs distributed at contract pharmacies." 2018 GAO Report at 44.

81.     The use of contract pharmacies can also exacerbate unlawful "duplicate discounting." 42 U.S.C. § 256b(a)(5)(A). Unlawful duplicate discounting forces the manufacturer to provide a discount on its drug twice-over—once under 340B to the covered entity, and again in the form of a rebate to the state Medicaid agency.

82.     GAO has found that duplicate discounting happens with outsized frequency when covered entities use contract pharmacies. *See, e.g.*, 2018 GAO Report at 45; *see generally* GAO, GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (2020), https://tinyurl.com/mr38ccjr. As the GAO

explains, this is because of the difficulty of auditing and obtaining reliable data for covered entities with "complex" networks of contract pharmacies.  2018 GAO Report at 45.

### D.    Covered Entities' Repeated Efforts To Expand The Federal 340B Program

83.    Covered entities have repeatedly attempted to circumvent federal authority over 340B to impose their own preferred obligations on 340B manufacturers.

84.    In 2006, covered entities filed suit against several pharmaceutical manufacturers, claiming that they had been overcharged for 340B-priced drugs in violation of the PPAs between manufacturers and the federal government.  *Astra*, 563 U.S. at 116-17.  In 2009, on review, the Supreme Court unanimously rejected such private actions as an alternative 340B enforcement mechanism, emphasizing the need for 340B to be uniformly administered with an eye toward implications for other federal healthcare programs.  *Id.* at 120.  As the Supreme Court held, "Congress vested authority to oversee compliance with the 340B Program in HHS and assigned no auxiliary enforcement role to covered entities."  *Id.* at 117.  Rather than allowing "340B entities to launch lawsuits in district courts across the country," with the attendant "risk of conflicting adjudications," "Congress directed HRSA to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers."  *Id.* at 120-21.  "Congress thus opted to strengthen and formalize HRSA's enforcement authority, to make the new adjudicative framework *the proper remedy*[.]"  *Id.* at 121-22 (emphasis added).

85.    Approximately ten years later, with the continued explosion in contract pharmacy arrangements, the increased use of the product replenishment model and documented problems with program integrity, certain PhRMA members independently adopted new and different policies to address the 340B abuses reported by federal watchdogs.  *See, e.g.*, First Am. Compl. ¶¶ 48-52; *AstraZeneca Pharms. LP v. Becerra*, No. 1:21-cv-00027 (D. Del. Feb. 12, 2021), ECF No. 13.

86.    The conditions of these policies, including limits on the number of contract pharmacies used and a requirement that claims data be provided, are configured into the programming logic of the distributor's platform that covered entities and their contract pharmacies use to purchase the manufacturer's drugs through the 340B program.

87.    This programming logic also blocks contract pharmacies that are ineligible (because the relevant covered entity has not accepted a manufacturer's 340B contract pharmacy policy conditions) from purchasing 340B-priced drugs under the relevant manufacturer's 340B contract pharmacy policy conditions.

88.    If a covered entity designates a contract pharmacy consistent with the manufacturer's 340B contract pharmacy policy and accedes to the terms of the contract pharmacy policy conditions, the manufacturer includes the designated contract pharmacy on the list of eligible contract pharmacies that it provides to distributors.

89.    The drug's distributors then configure their systems to allow contract pharmacies on the manufacturer's list to access 340B pricing and block those not on the manufacturer's list from purchasing the drug at the 340B price.

90.    Thus, if a covered entity does not accept the conditions of the contract pharmacy policy, it (or a contract pharmacy purporting to act on its behalf) cannot purchase drugs through the 340B program.  However, a covered entity that does not accept a manufacturer's contract pharmacy conditions, and any contract pharmacies affiliated with it, can still purchase drugs from the manufacturer outside of the 340B program at a commercial price for shipment to contract pharmacies, so long as the pharmacies qualify under relevant laws and requirements to receive the drugs.

91.    Similarly, if required by the manufacturer, a covered entity must accept a manufacturer's offer with a claims data condition to purchase 340B drugs.  If a covered entity does not agree to the manufacturer's contract pharmacy or claims data policy conditions, the manufacturer would not include the covered entity's contract pharmacies on the list of 340B-eligible customers that it sends to distributors.

92.    In turn, the distributor would block the covered entity's contract pharmacies from purchasing the manufacturer's drugs at 340B prices.

93.    Given this, a covered entity, or a contract pharmacy purporting to act on a covered entity's behalf, is unable to purchase a manufacturer's drugs through the 340B program and at 340B prices unless the covered entity first agrees to the terms of the manufacturer's 340B contract pharmacy and claims data conditions, which are part of the manufacturer's 340B offer.

94.    In response to manufacturers' policies, the General Counsel of HHS issued a legal opinion on December 30, 2020, purporting to interpret the 340B statute and declaring that "*to the extent* contract pharmacies are acting as *agents* of a covered entity, a drug manufacturer in the 340B Program is obligated to deliver its covered outpatient drugs to those contract pharmacies and to charge the covered entity no more than the 340B ceiling price for those drugs." *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 52-53 (D. Del. 2021).  Although the Advisory Opinion was subsequently vacated on other grounds, it demonstrated HHS's understanding that, at a minimum, an agency relationship is required between a covered entity and its contract pharmacy, echoing prior HRSA guidance.  61 Fed. Reg. at 43,550, 43,555 (HRSA 1996 guidance stating that a covered entity without an in-house pharmacy could contract with *one* contract pharmacy to serve as its "agent").

95.    In May 2021, HRSA issued letter decisions to the manufacturers that were implementing policies to address 340B abuses, including PhRMA members.[5]  Litigation ensued.

96.    In the context of those suits, courts have repeatedly concluded that the scope of manufacturers' obligations does not encompass offering or providing 340B-priced drugs to an unlimited number of contract pharmacies—the requirement Nebraska seeks to impose here.

97.    The D.C. Circuit in *Novartis* and the Third Circuit in *Sanofi*, considering two of these lawsuits, began their recent analyses by explaining how the federal statute works and how contract pharmacy and claims data policies interact with it.[6]

98.    In *Novartis*, one manufacturer was "willing to work with at least one contract pharmacy designated or previously used by the [covered] entity," so long as the "contract pharmacies provide claims data for contract-pharmacy orders."  102 F.4th at 463.  The other manufacturer "intend[ed] to deliver section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity."  *Id.* at 463-64.  In *Sanofi*, two manufacturers permitted the use of "one contract pharmacy" if the covered entity "d[id] not have an in-house pharmacy."  58 F.4th at 701.  A third manufacturer similarly permitted the use of "one contract pharmacy" if the covered entity "d[id] not have an in-house pharmacy," but also permitted

---

[5] *See* HRSA, 340B Drug Pricing Program, *HRSA Determines Six Pharmaceutical Manufacturers Are in Violation of the 340B Statute*, Health Res. & Servs. Admin., HRSA Letter to AstraZeneca Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2nybf4z2; HRSA Letter to Lilly USA, LLC Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/5xkem3y7; HRSA Letter to Novartis Pharmaceuticals Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/jytw6xd6; HRSA Letter to Novo Nordisk Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/ycxwceaz; HRSA Letter to Sanofi Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2veh5838; HRSA Letter to United Therapeutics Regarding Sales to Covered Entities through Contract Pharmacy Arrangements, https://tinyurl.com/2p85wz8d.

[6] One appeal remains pending.  *See Eli Lilly & Co. v. Becerra*, Nos. 21-3128, 21-3405 (7th Cir.).

the use of "an unlimited number of contract pharmacies" if the covered entity "agree[d] to provide claims data." *Id.*

99.    The federal 340B program requires that manufacturers "'offer each covered entity covered outpatient drugs for purchase' at or below a specified ceiling 'price.'" *Novartis*, 102 F.4th at 460 (quoting 42 U.S.C. § 256b(a)(1)).  The covered entity who receives such an "offer" can then accept the terms of the offer and "purchase" the covered outpatient drugs, or they can decide to not "assent to the same terms" and thus reject the 340B offer.  *Id.* (quoting 1 *Corbin on Contracts* § 1.11 (2023)); *see also Sanofi*, 58 F.4th at 703 (holding that manufacturers are required to only "present the drugs [with conditions permitted] for covered entities' acceptance").  Indeed, that Congressional mandate does not "require the offeror to accede to any distribution terms demanded by the offeree." *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703 (holding that the word "offer" does not "imply that the offeror must deliver goods wherever and to whomever the buyer demands").  Where a covered entity rejects the offer, the manufacturer has fulfilled its 340B duty and there is no 340B purchase to which the 340B ceiling price applies.  *See Novartis*, 102 F.4th at 460; *Sanofi*, 58 F.4th at 703-04.

100.    The D.C. Circuit rejected the assertion that manufacturers are required to provide 340B-priced drugs to an unlimited number of contract pharmacies.  *Novartis*, 102 F.4th at 460.  As the D.C. Circuit concluded, Congress chose to impose only certain restrictions on 340B-participating manufacturers—most notably that they make a "bona fide" offer, *i.e.*, that they "propose to sell covered drugs to covered entities at or below a specified monetary amount." *Id.* Congress's judgment means that manufacturers remain free to impose "conditions on the distribution of covered drugs to covered entities." *Id.* at 459-60.

101.    And the D.C. Circuit similarly rejected the notion that purported silence allowed for imposition of an unlimited contract pharmacy requirement.  As that court noted, purported "silen[ce] about delivery conditions . . . preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions."  *Id.* at 460-61.  The court also noted that this silence did not mean that manufacturers have carte blanche as to conditions.  *Id.* at 462-63.  Instead, Congress carefully circumscribed the obligations it placed on manufacturers, only permitting conditions that would not move offers out of the realm of "bona fide" offers.  *Id.*  The court expressly left to the federal government adjudication of "more onerous conditions" on offers than the ones before it, reviewed by federal courts.  *Id.* at 464.

102.    The Third Circuit's decision in *Sanofi* likewise rejected the very same obligation Nebraska seeks to impose here.  58 F.4th at 703-04.  The Third Circuit noted that "Congress's use of the singular 'covered entity' in the [statute's] 'purchased by' language suggests that it had in mind one-to-one transactions between a covered entity and a drug maker *without mixing in a plethora of pharmacies*."  *Id.* (emphasis added); *id.* at 704 (340B does not "require[] delivery to an unlimited number of contract pharmacies").  The Third Circuit also expressly enjoined the federal government from imposing this requirement.  *Id.* at 706 (barring the federal government "from enforcing against [plaintiffs] its reading of Section 340B as requiring delivery of discounted drugs to an unlimited number of contract pharmacies"); *id.* at 704 (noting that "'Congress knew how to' grant covered entities permission to contract with third parties for distribution . . . but did not" (quoting *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 36, 39 (2016))).

103.    In doing so, the Third Circuit concluded that, despite the statute's "silence" as to the number of permitted contract pharmacies, such an unlimited contract pharmacy requirement "overstepped the statute's bounds," as reflected in 340B's structure and other considerations.

*Sanofi*, 58 F.4th at 707.  The Third Circuit left open the possibility, however, that the federal obligation may require that manufacturers offer to deliver 340B-priced drugs to some pharmacies in certain circumstances (for example, a single contract pharmacy where a covered entity lacks its own in-house pharmacy).  42 U.S.C. § 256b(a)(1); *Sanofi*, 58 F.4th at 703-04.  Thus, *Sanofi* ultimately recognizes there is no gap in 340B into which states can step—instead the question requires interpretation of federal law, specifically what constitutes a bona fide "offer" under 42 U.S.C. § 256b(a)(1).  *Id.* at 705.

104.    Two other courts are in accord.  The U.S. District Court for the District of Columbia determined in *Novartis*, 2021 WL 5161783, and the court of appeals affirmed, *Novartis*, 102 F.4th at 455, that the 340B statute does not bar drug manufacturers from imposing reasonable conditions regarding contract pharmacies as part of the manufacturers' participation in 340B, including a reasonable limitation on where manufacturers will send 340B-priced drugs.  2021 WL 5161783, at *7; *Novartis*, 102 F.4th at 460-64 (affirming and holding conditions were permissible).  In a similar vein, the U.S. District Court for the District of Delaware concluded in *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 58-59 (D. Del. 2021), and the court of appeals affirmed, *Sanofi*, 58 F.4th at 703-06, that Congress chose not to require manufacturers to provide 340B-priced drugs to an unlimited number of contract pharmacies.  *AstraZeneca*, 543 F. Supp. 3d at 58-59; *Sanofi*, 58 F.4th at 703-06 (affirming and holding 340B program does not require delivery to an unlimited number of contract pharmacies).

105.    The same is true of manufacturers' conditions on their offers of 340B-priced drugs that require covered entities and contract pharmacies to provide certain claims data related to the prescriptions that were purportedly dispensed as 340B drugs.  Courts have concluded that manufacturers may impose such conditions (including to help fulfill statutory audit protections),

and that those conditions on a 340B offer satisfy the federal obligation.  *See Novartis*, 2021 WL 5161783, at *8 (holding that, under federal law, manufacturers are permitted to require claims data as a condition on their "offer" of 340B-priced drugs); *Novartis*, 102 F.4th at 463 (affirming and holding conditions were permissible).  That leaves covered entities free to accept such offers, along with their terms, or reject them.

106.    For their part, covered entities have sought to use the federal ADR mechanism, which is overseen by a panel within HHS, to enforce this purported obligation to provide 340B-priced drugs to any and all contract pharmacies identified by a covered entity.  In those proceedings, a group of covered entities alleged that a drug manufacturer "ha[d] violated the 340B statute and regulations by failing to offer covered outpatient drugs at the 340B ceiling price through Petitioner's contract pharmacy arrangements."  Those entities asked the panel "to order [the manufacturer] to resume offering covered outpatient drugs at the 340B ceiling price to Petitioner through its contract pharmacies; and to order [the manufacturer] to pay Petitioner an amount equal to the 340B discounts that [the manufacturer] has failed to provide."  Petition for Damages and Equitable Relief ¶ 1, *Open Door Cmty. Health Ctrs. v. AstraZeneca Pharms., LP*, ADR ID: 210112-1 (HHS ADR Bd. Jan. 13, 2021), https://tinyurl.com/2twhwhtc; *see also* Petition for Monetary Damages and Equitable Relief ¶¶ 35-37, *Univ. of Wash. Med. Ctr. v. AstraZeneca Pharms. LP* (HHS Bd. Sept. 29, 2023) (Petition by a different group of covered entities asserting panel has jurisdiction over contract pharmacy disputes).

107.    Recently, an ADR Panel within HRSA adjudicated an ADR petition premised on an alleged 340B overcharge violation and held that manufacturer contract pharmacy policies *do not* constitute a violation of 340B.  *See* HRSA ADR Panel, *St. Croix Reg'l Med. Ctr.* Decision Summary (2025), https://tinyurl.com/3pvw43zd.

108.    Against the backdrop of unfavorable federal outcomes, covered entities turned their sights to lobbying states to seek benefits they are not owed under federal law.  They seek to change the federal program by mandating that manufacturers take actions that even the federal agency tasked with 340B's administration and enforcement cannot require.

109.    The repercussions of those efforts, if allowed to stand, will be intensified by the recently enacted Inflation Reduction Act ("IRA").[7]  The IRA establishes the Medicare Drug Price Negotiation Program, under which HHS is to "negotiate" with manufacturers "maximum fair prices" for certain drugs. 42 U.S.C. § 1320f-3(a).  Manufacturers must provide access to selected drugs at the so-called maximum fair prices, established by HHS, except that they need not provide access to the maximum fair prices when such selected drugs are 340B-eligible and the 340B price is lower than the maximum fair price.  *Id.* § 1320f-2(d).  That is, manufacturers need not provide both the 340B price and "maximum fair price" on the same selected drug.  *Id.*  To avoid duplicate discounting, this scheme necessarily requires identifying when a drug subject to the maximum fair price is dispensed as a 340B drug—further demonstrating the "interdependent nature" of Medicare and the 340B program.  *Astra*, 563 U.S. at 120.

110.    The Centers for Medicare and Medicaid Services ("CMS") has issued final IRA guidance for avoiding duplicate discounting under the Medicare Drug Price Negotiation Program. Under that guidance, a manufacturer bears the burden of determining and verifying whether a "claim for a selected drug is a 340B-eligible claim."  CMS, Medicare Drug Pricing Negotiation Final Guidance ("Final Guidance") at 60, https://tinyurl.com/3sx8hmah; *see also* CMS, Medicare Drug Price Negotiation Program Draft Guidance ("Draft Guidance"), at 48 (A manufacturer must

---

[7] Several of PhRMA's members have drugs that are subject to the IRA's Medicare Drug Price Negotiation Program, including Boehringer Ingelheim Pharmaceuticals, Bristol Myers Squibb Company, Astellas, Novo Nordisk, and Merck.

"indicate[] that the claim for [a] selected drug is a 340B-eligible claim and the 340B ceiling price is lower than the [maximum fair price] for the selected drug."), https://tinyurl.com/dapyyjyf. To facilitate the identification of 340B drugs, dispensing entities are encouraged to use claims codes indicating which drugs are dispensed under the 340B program, and to provide prescriber identification information to help manufacturers identify "whether a prescription was written by a prescriber with a high percentage of claims originating from a 340B covered entity." Draft Guidance at 41; Final Guidance at 45, 57. Commenters noted "that, under the nonduplication approach described by CMS in the draft guidance, [IRA] Manufacturers would likely mandate 340B claims data submission from covered entities." Final Guidance at 57. "Many commenters strongly opposed CMS allowing for such mandates and stated that, at minimum, CMS should evaluate and regulate the data requirements imposed by [IRA] Manufacturers on covered entities." *Id.* In response to such comments, CMS stated it "will not prescribe a specific nonduplication approach that [IRA] Manufacturers must follow or impose parameters" on it, and noted in its justification that manufacturers bear the burden for ensuring nonduplication. *Id.* at 57-58; *id.* at 54 (stating CMS "will not assume responsibility for deduplicating discounts between the 340B ceiling price and the [maximum fair price]").

111. On August 1, 2025, HRSA issued guidance discussing one mechanism for qualifying drug manufacturers to provide the 340B ceiling price: so-called "rebate models," which involve collecting claims data and then using retroactive rebates, rather than upfront discounting, to supply the 340B price. *See* HRSA, Announcement of Application Process for the 340B Rebate Model Pilot Program & Request for Public Comment, 90 Fed. Reg. 36,163 (Aug. 1, 2025). As the notice explains, manufacturers seek to use rebate models, including claims data collection as part

of the models, to detect and prevent duplicate discounts (including duplicate discounts under the IRA) and diversion. *Id.*

112.    The announcement explains HRSA's view that it has authority over and regulates terms of 340B participation, including the ability to use such rebate models. *Id.* at 36,163-65. In addition to expressly permitting the use of rebates for qualifying manufacturers, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models to guard against duplicate discounting. *Id.* at 36,164-64. HRSA's recent guidance further underscores that 340B issues like claims data collection as part of manufacturers' 340B offers and the use of rebates to provide the 340B ceiling price are exclusively questions of federal law, with interlinked effects on 340B, Medicare (including the new IRA requirements), and Medicaid, that require delicate balancing and analysis of their effects across these other federal programs. *Id.* at 36,164 (noting that implementation of mechanism requires "methodical and thoughtful approach" and seeking comment on various effects).

### E.    Nebraska Enacts L.B. 168 To Impose State-Law Requirements On 340B

#### 1.    L.B. 168's Passage and Requirements

113.    On April 9, 2025, L.B. 168 was signed into law, and became immediately effective.

114.    L.B. 168 expressly provides that its regulatory object is the federal 340B program and 340B-priced drugs. L.B. 168 §§ 2(1), (2) (defining "340B drug" and "340B entity" with reference to the federal program).

115.    L.B. 168 instructs that a manufacturer "shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of any 340B drug by or delivery of any 340B drug to any location authorized by any 340B entity to receive such 340B drug, unless receipt of such 340B drug is prohibited by federal law." *Id.* § 3(1).

116.    L.B. 168 imposes that requirement without recognition that, in instances where covered entities do not accept the "offer" made by manufacturers that contain reasonable conditions related to contract pharmacies and claims data, there is no "purchase" of 340B-priced drugs to which the "acquisition . . . or delivery" mandate in the preceding paragraph could apply.

117.    L.B. 168 also provides that a manufacturer "shall not, either directly or indirectly, require any 340B entity to submit any data, including any claim data, utilization data, encounter data, medical data, purchasing data, or other data, as a condition for allowing acquisition of any 340B drug by or delivery of any 340B drug to any 340B entity or to any location authorized by any 340B entity to receive such 340B drug, unless such data is required by federal law." *Id.* § 3(2).

118.    L.B. 168 imposes that requirement without recognition that to access the federal audit process to engage in an ADR proceeding, manufacturers must be able to access information that will allow them to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions.

119.    L.B. 168 does not define "location" as used in either provision.

        2.    Enforcement

120.    L.B. 168 does not acknowledge the limitations on enforcement power Congress deemed necessary to maintain the 340B program's delicate balance.

121.    L.B. 168 gives enforcement authority to the Nebraska Attorney General or any county attorney and permits them to commence an action "for an injunction or other processes." *Id.* § 4. L.B. 168 does not define what constitutes the referenced "other processes."

122.    L.B. 168 expressly rests its purported addition of a state law obligation on the existence of a preexisting federal obligation.  L.B. 168 §§ 2(1), (2).

123.    As a result, in any state enforcement proceeding, a state adjudicator will be required to answer multiple questions of federal law to determine if a manufacturer violated L.B. 168.

These include, among other things, whether under *federal* law (1) a particular covered entity has permissibly contracted with a contract pharmacy and has the necessary "principal-agent" relationship required to even arguably comply with federal law, 42 U.S.C. § 256b(a)(5)(A)-(B); (2) the covered entity continues to "hold title" to the 340B-priced drugs throughout all relevant transactions (which does not occur under the prevailing product "replenishment model"); (3) all of the individuals receiving 340B-priced drugs meet the federal definition of a 340B patient; (4) the particular prescriptions at issue qualify for 340B prices; and (5) the 340B price reductions are duplicative of Medicaid rebates applicable to the same prescriptions, *id.* § 256b(a)(5)(A). A state adjudicator will also be required to determine if a covered entity continues to qualify for participation in the federal program. For example, a covered entity that sells or transfers 340B-priced drugs to anyone other than its patients is no longer eligible to receive 340B-priced drugs. *Id.* § 256b(a)(5). Similarly, covered entities violating prohibitions on duplicate discounts are ineligible to receive any 340B-priced drugs. *Id.* § 256b(a)(4)-(5). A Nebraska state adjudicator would be required to make these determinations to adjudicate any purported violation of L.B. 168.

## CLAIMS FOR RELIEF

### CLAIM I
### (Declaratory/Injunctive Relief—Preemption Under the Supremacy Clause of the U.S. Constitution – Contract Pharmacy Limitations)

124. PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

125. Federal law is "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Conflict preemption arises when "[state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or "interferes with the methods by which the federal statute was designed to" achieve those purposes and

objectives, *Int'l Paper*, 479 U.S. at 494 (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *see also Forest Park*, 336 F.3d at 733.

126.    L.B. 168's contract pharmacy provisions—which prohibit manufactures from restricting the number of contract pharmacies to which they will send 340B-priced drugs and bans manufacturers from imposing the one-contract-pharmacy limit addressed in *Novartis* and *Sanofi*— are preempted because they directly conflict with the federal statute's terms and the balance struck by Congress.

127.    Manufacturers discharge their obligation under 340B when they make a bona fide offer to sell drugs to covered entities, and such an offer can include reasonable conditions like contract pharmacy limitations.  Absent L.B. 168, a covered entity that refused to accept these conditions would reject the offer, and no 340B purchase would take place.  With L.B. 168, a manufacturer is compelled to sell the 340B-priced drug to the covered entity, even though their lawful offer under federal law was *not accepted.  See* L.B. 168 §§ 2(1), 3(1).

128.    The statute thus compels manufacturers to sell 340B-priced drugs even though the offered conditions were *not accepted*, so long as the drug is one that a covered entity otherwise "may purchase" under 340B.  *Id.*

129.    L.B. 168 attempts to override Congress's choice to implement 340B through an "offer" framework that allows manufacturers to impose reasonable conditions, including contract pharmacy limitations, on their offers.  *See Int'l Paper*, 479 U.S. at 494 (holding state law preempted, despite it sharing the same "ultimate goal" as federal law, because it "interfere[d] with the methods by which the federal statute was designed to reach th[e] goal").

130.    L.B. 168 expands the scope of manufacturers' 340B obligations (otherwise the law would serve no purpose), fundamentally altering the bargain struck by Congress for manufacturer participation in 340B.  *See, e.g., Forest Park*, 336 F.3d at 730, 732-33 (holding that where Congress enacts a program that relies on participation by private parties via incentives and sets the obligations of those private parties under the program, additional state obligations conflict with the federal scheme, whether or not they purportedly serve the same "purpose"); *Villas at Parkside*, 726 F.3d at 531 (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted).

131.    For all of those reasons, L.B. 168's restrictions on contract pharmacy conditions are preempted, and their enforcement should be enjoined.

## CLAIM II
### (Declaratory/Injunctive Relief—Preemption Under the Supremacy Clause of the U.S. Constitution and the Federal 340B Statute – Claims Data Policies)

132.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

133.    L.B. 168's restrictions on manufacturers' ability to collect claims data are conflict preempted.  L.B. 168 § 3(2).

134.    First, *see supra* ¶¶ 100-05, manufacturers fulfill their obligation under 340B when they make a bona fide offer to sell drugs to covered entities, which can include a requirement that the covered entity provide claims data.  Absent L.B. 168, a covered entity that refused to accept a manufacturer's claims data condition would reject the offer, and no 340B purchase would take place.  L.B. 168, however, directly conflicts with that mechanism by requiring a manufacturer to sell the 340B-priced drug to the covered entity, even though its lawful offer under federal law was *not accepted*.  Congress's decision to allow this type of condition is significant given the use of the data in accessing the federal enforcement regime.  *See infra* ¶¶ 137-40.

40

135.    Second, L.B. 168's claims data restrictions are conflict preempted for yet another reason:  They will essentially break the federal remedial regime.  *See Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data was preempted because it conflicted with manufacturers' 340B audit rights and restricted access to the federally administered ADR system); *Eli Lilly*, 2025 WL 1423630, at *2-4, *12-14 (affirming manufacturers' right to "impose data-reporting conditions on covered entities," explaining why claims data is important to maintaining program integrity, and requiring federal agency to take it into account when considering how manufacturers can structure their program participation).

136.    Through claims data conditions, manufacturers require covered entities and their contract pharmacies to provide certain data on the prescriptions they claim are 340B-eligible so that they can identify potential duplicate discounts and diversion.  *See Novartis*, 2021 WL 5161783, at *8 (discussing importance of claims data for utilizing federal enforcement regime and detecting abuses); *Novartis*, 102 F.4th at 463 (similar).  As both the D.C. and Third Circuits have held, claims data conditions are allowed in 340B offers.  *See Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.  Yet L.B. 168 expressly prohibits manufacturers from requiring claims data. *See* L.B. 168 §§ 2(1), 3(2).

137.    Under the federal regime, manufacturers must first audit a covered entity before initiating ADR.  *See* 42 U.S.C. § 256b(a)(5)(C), (d)(3)(B)(iv).  However, manufacturers are only permitted to conduct an audit where they "ha[ve] documentation which indicates there is reasonable cause."  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).  "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibition on transfer or sale, or the prohibition on duplicate discounting.  *Id.*  Accordingly, to even access the audit process to engage in an ADR proceeding, manufacturers must be able to

access information that will allow them to determine if reasonable cause exists to suspect a covered entity is violating 340B's provisions.

138.    But Nebraska's comprehensive bar on requesting any such data hides from manufacturers evidence of federal violations and handicaps manufacturers from being able to meaningfully utilize the federal resolution process that Congress created.  *See* L.B. 168 § 3(2) (broadly referring to "any claim data, utilization data, encounter data, medical data, purchasing data, or other data").  This creates a direct conflict with the federal regime.  As the *Morrisey* court stated:  "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B.  760 F. Supp. 3d at 453.  L.B. 168 directly subverts the federal enforcement mechanism.

139.    Nor is it any answer that manufacturers could request claims data on a voluntary basis.  Covered entities have fiercely resisted efforts to provide claims data to manufacturers.  In 2020 when a manufacturer attempted to gather claims data on a voluntary basis, 340B Health, an association representing over 1,600 340B covered entity participants, informed its members that they had "no legal obligation" to provide data and that "noncompliance" with the request was "unlikely to result in audits," in part because the manufacturer "could not feasibly audit the thousands of covered entities that received its letter."  340B Health, *Hospitals Should Consider Legal & Operational Burdens Imposed by Merck's Request for Data that there is No Legal Obligation under 340B to Provide* 1, 4-5 (July 20, 2020), https://tinyurl.com/2xrz5w8p.  On information and belief, covered entities have refused and continue to refuse to provide claims data to manufacturers on a voluntary basis in the absence of claims data requirements.

140.    The conflict is reinforced by L.B. 168's impact on rooting out duplicate discounting.  Under the new Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers the "maximum fair price[s]" for certain drugs.  42 U.S.C. § 1320f-3(a).  Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except when such selected drugs are 340B-eligible and the 340B price is lower.  *Id.* § 1320f-2(d).  To avoid duplicating price reductions, this scheme necessarily requires identifying when a specific drug is acquired at the 340B price, a burden the Centers for Medicare and Medicaid Services ("CMS") places on manufacturers.[8]  As a result, manufacturers require claims data to avoid providing duplicative price reductions.  And to utilize this information to avoid providing duplicate discounts, manufacturers require it to be provided contemporaneously or close in time to the dispensing of the drug.  Yet, L.B. 168 bars its collection.

### CLAIM III
### (Declaratory/Injunctive Relief—Preemption Under the Supremacy Clause of the U.S. Constitution and the Federal 340B Statute – Preemption Generally)

141.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

142.    L.B. 168 is both field and conflict preempted.

143.    First, L.B. 168 invades an exclusively federal field.  Field preemption exists where (1) Congress's "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," or (2) there is a dominant federal interest.  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  It is especially likely where a state law "diminish[es] the [federal government]'s

---

[8] CMS, Medicare Drug Pricing Negotiation Final Guidance 57-58, 60 (Oct. 2, 2024) (stating CMS "will not assume responsibility for deduplicating discounts" and that manufacturers bear that burden), https://tinyurl.com/3sx8hmah.

control over enforcement and detract[s] from the integrated scheme of regulation created by Congress." *Id.* at 402.

144.    Those principles have particular force for statutes like 340B that are enacted pursuant to Congress's spending powers.  Here, Congress provided that, for manufacturers to receive payment from the government under Medicare and the federal share of Medicaid, they must enter into a contract, the Pharmaceutical Pricing Agreement, with the Secretary of HHS that specifies the manufacturers will provide their drugs at steeply reduced prices to covered entities. 42 U.S.C. § 256b(a)(1); *Sanofi*, 58 F.4th at 699; *Novartis*, 102 F.4th at 455.  Congress has thus made 340B participation one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s]," *Rumsfeld*, 547 U.S. at 59.

145.    Congress placed strict limits on the types of entities entitled to 340B pricing and the types of patients that may receive drugs sold at a 340B price.  Specifically, Congress provided that only "covered entities" are eligible to receive 340B pricing, and it expressly defined that term to include only fifteen enumerated types of medical facilities.  Contract pharmacies are not among the fifteen enumerated covered entities.  Congress, therefore, did not intend for retail pharmacies to receive discounted 340B pricing.  *See Meese v. Keene*, 481 U.S. 465, 484 (1987) ("It is axiomatic that the statutory definition of [a] term excludes unstated meanings of that term."); *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) ("[A] definition which declares what a term 'means' . . . excludes any meaning that is not stated.").

146.    Congress also expressly prohibited any covered entity from reselling or otherwise transferring a drug bought at the 340B price to anyone other than its patients:  "With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity

44

shall not resell or *otherwise transfer* the drug to a person who is not a patient of the entity." 42 U.S.C. § 256b(a)(5)(B) (emphasis added). Several PhRMA members have taken the position in litigation that because a contract pharmacy is not a patient of a covered entity, it is prohibited by federal statute from receiving 340B-program drugs. At a minimum, it is clear that the 340B statute does not expressly allow *covered entities* to transfer drugs to retail pharmacies or require manufacturers to engage in such transfers on behalf of covered entities.

147. L.B. 168, by contrast, purports to *require* drug manufacturers to transfer drugs at 340B prices to pharmacies that maintain a contract with a covered entity—a requirement that can nowhere be found in federal law. It also appears to require manufacturers to do so without regard to whether those drugs will ultimately be dispensed to any patient of a covered entity—without regard to the requirements of federal law.

148. Nebraska thus seeks to impose its own obligations on any manufacturer that agreed to accept federal funds. But states do not have the power to impose additional conditions on participation in federal spending power programs unless Congress authorizes them to do so, which Nebraska does not and cannot claim Congress has done here.

149. Ultimately, Nebraska is trying to alter, *ex post*, the bargained-for consideration of an exclusively federal contract, by requiring drug manufacturers to offer steeply reduced pricing even when the 340B program does not require them to do so. But states cannot rewrite private parties' contracts with the federal government in this way: "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).

150. Second, L.B. 168 impermissibly intrudes on and conflicts with the exclusive federal enforcement regime that Congress established. *See Astra*, 563 U.S. at 113; *Morrisey*, 760 F. Supp.

3d at 453-60 (holding similar state law was preempted because it conflicted with 340B's enforcement regime); *see also Buckman v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349-50 (2001) (where agency had "a variety of enforcement options that allow it to make a measured response," greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives"). In *Astra*, covered entities operated by Santa Clara County brought suit to enforce 340B pricing against drug manufacturers directly rather than bringing that issue to HRSA. *See* 563 U.S. at 116-17. Two things happened. First, in response to such disputes, Congress stepped in and amended the 340B statute to add detailed administrative enforcement mechanisms—all to be overseen by HRSA, subject to federal court review. 42 U.S.C. § 256b(d). Second, the Supreme Court ruled against Santa Clara County, explaining that the new federal agency administrative enforcement mechanisms were the "proper remedy" for disputes about the operation of 340B. *Astra*, 563 U.S. at 119-22. The Court stressed repeatedly that it was essential 340B be administered "harmoniously and on a uniform, nationwide basis." *Id.* at 120.

151. L.B. 168 intrudes on and conflicts with that regime in multiple ways. Like the claims considered in *Astra*, L.B. 168 conflicts with the federal enforcement regime by usurping the federal agency's unitary enforcement authority. Federal ADR regulations issued in 2024 make clear HRSA's view that it has federal statutory authority to address the same issues as L.B. 168, including through ADR. *See* 89 Fed. Reg. at 28,649 (defining overcharge claim, to be brought via ADR, to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"); *see also supra* ¶¶ 107 (discussing recent ADR decision addressing these very same issues and finding contract pharmacy policy does not violate 340B). In other

words, the federal government believes it has authority to address the same issues that L.B. 168 purports to regulate—when and under what terms 340B-priced drugs must be provided.  *Id.*; 42 U.S.C. § 256b(d)(1) (covering "overcharges and other violations of the discounted pricing requirements").  Yet Nebraska seeks to address the very same dispute, contra to *Astra*.  *Morrisey*, 760 F. Supp. 3d at 453-59.

152.    A preview of potential state enforcement proceedings drives the impermissible conflict home.  Nebraska has tied L.B. 168 to 340B.  Accordingly, determining whether a manufacturer violated L.B. 168 requires determining if there was an underlying 340B obligation in the first place.  To make the latter determination, a decisionmaker will need to answer several federal law questions, including: (1) whether the drugs are actually covered outpatient drugs under 340B; (2) whether they are eligible for 340B pricing; (3) whether the manufacturer provided the 340B price; (4) whether a covered entity is a 340B covered entity under federal law; and (5) whether there has been diversion or duplicate discounting (which includes determining whether a specific drug was distributed to a covered entity's "patient").  *Morrisey*, 760 F. Supp. 3d. at 458-59; *Eli Lilly*, 2025 WL 1423630, at *2 (noting requirements for an individual to qualify as a "patient of a covered entity).[9]

153.    For those reasons, L.B. 168 is both field and conflict preempted.

### CLAIM IV
### (Declaratory/Injunctive Relief—Unconstitutional Extraterritorial Regulation)

154.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

---

[9] To the extent *McClain* addressed this third theory of preemption in the context of the Arkansas law at issue there, its analysis is inapplicable here.  *See supra* ¶ 20.

155.    Under our constitutional framework, states may not directly regulate conduct that takes place wholly in another state.  "[A]ll States enjoy equal sovereignty."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 535 (2013).  "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (citation omitted).

156.    While the Supreme Court recently clarified that state laws regulating conduct within the state's borders in a way that might have an "extraterritorial effect" in other states are not categorically barred, it also made clear that it was not addressing a state law that "directly regulated out-of-state transactions."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023).  The understanding that states may not impose on other states' regulatory powers follows from several Constitutional provisions.  States are denied certain powers that a sovereign might ordinarily impose, U.S. Const. art. I, § 10; and required to honor certain rights of other states, U.S. Const. art. IV, §§ 1, 2, 3.  Similarly, the Due Process Clause limits a state's ability to regulate conduct occurring wholly outside its borders.  *See Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (similar).

157.    Most notably, the Commerce Clause provides that "[t]he Congress shall have Power … To regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3.  Under that clause, states are prohibited from directly "control[ling] commerce occurring wholly outside

[its] boundaries." *Nat'l Pork Producers Council*, 598 U.S. at n.1; *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.).

158.    L.B. 168 is unconstitutional under these principles.  L.B. 168 broadly bans all pharmaceutical manufacturers—many of whom have no physical presence in Nebraska—from "directly or indirectly deny[ing], restrict[ing], or prohibit[ing]" "acquisition of any 340B drug" or from requesting claims data.  L.B. 168 §§ 3(1), (2).

159.    None of PhRMA's members are headquartered in Nebraska.

160.    Drug manufacturers, including PhRMA's members, primarily sell their drugs that end up in Nebraska through distributors, who are also located outside of Nebraska.

161.    These out-of-state distributors then sell drugs to healthcare facilities and pharmacies, some of whom are located in Nebraska.

162.    Additionally, in some circumstances where a Nebraska covered entity or pharmacy receives the 340B price on a drug from an out-of-state distributor, the out-of-state distributor then seeks the difference between the lower 340B price and the original price paid by the out-of-state distributor to the out-of-state manufacturer, including PhRMA's members, in a subsequent transaction.  The subsequent transaction also occurs wholly outside Nebraska.

163.    L.B. 168's plain text contains no text limiting its application to manufacturers, distributors, and contract pharmacies located in Nebraska.

164.    As a result, L.B. 168 regulates conduct occurring wholly beyond the borders of Nebraska, including transactions between manufacturers and their distributors as well as pharmacies outside of Nebraska.  Not only will L.B. 168 require manufacturers to provide the 340B price on out-of-state transactions of out-of-state manufacturers with out-of-state distributors and contract pharmacies, it will also, given the offer-and-acceptance regime, force manufacturers

to enter into many 340B transactions that they otherwise would not. In sum and substance, L.B. 168 tells out-of-state manufacturers that they cannot condition their upstream sales to out-of-state distributors at the 340B price on compliance with contract pharmacy policies.

165.    L.B. 168 is also discriminatory. It privileges in-state interests by providing them monetary benefit not contemplated by Congress, while imposing a significant burden on out-of-state manufacturers.

166.    Finally, the extraterritorial reach of L.B. 168 is further heightened by the remedies available for violations of L.B. 168. L.B. 168 authorizes prohibitory injunctions, among other things, sought by Nebraska's Attorney General. *See supra* ¶¶ 121.

167.    By directly regulating commerce that occurs entirely outside of its borders, L.B. 168 violates the Constitution's bar on extraterritorial state regulation. *See Ellison,* 2025 WL 1660112, at *1-3 (affirming preliminary injunction of a Minnesota law that barred manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase, whether directly or through a wholesale distributor, pharmacy, or similar intermediary, on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state"); *Styczinski v Arnold*, 46 F.4th 907 (8th Cir. 2022) (same as to Minnesota law that regulated transactions with a "consumer who lives in Minnesota" because a trader could violate the law "without conducting a single transaction in Minnesota"); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (striking down a Maryland drug-pricing law that "directly regulates the price of transactions that occur outside Maryland[,]" where the law allowed "Maryland to enforce the Act against parties to a transaction that did not result in a single pill being shipped to Maryland").

## **PRAYER FOR RELIEF**

PhRMA respectfully prays that this Court:

      a.     issue an order and judgment declaring that L.B. 168 is unconstitutional and violates federal law;

      b.     issue an order and judgment declaring that L.B. 168 does not require PhRMA's members to offer, directly or through intermediaries including wholesalers and distributors, 340B pricing on their covered outpatient drugs to contract pharmacies in Nebraska or contract pharmacies located outside of Nebraska that fall within the ambit of the statute or transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

      c.     enjoin the implementation and enforcement of L.B. 168 against PhRMA's members and members' affiliates, officers, agents, representatives or contractors;

      d.     enjoin the implementation and enforcement of L.B. 168 as to the sale of PhRMA's members' drugs under 340B;

      e.     award PhRMA costs and reasonable attorneys' fees, as appropriate; and

      f.     grant any other relief the Court finds just and appropriate.

DATED this 1st day of August, 2025.

Respectfully submitted,

By: */s/ Alex Arkfeld*
Alex Arkfeld, #27277
Daniel J. Gutman, #26039
GUTMAN LAW GROUP
P.O. Box 485
Omaha, Nebraska 68101
(402) 570-8836
alex@glg.law
daniel@glg.law

and

51

Philip J. Perry*
Andrew D. Prins*
Abid R. Qureshi*
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com
andrew.prins@lw.com
abid.qureshi@lw.com
*Applications to be admitted pro hac vice
forthcoming*

*Counsel for Plaintiff Pharmaceutical
Research and Manufacturers of America*